AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*

Information Associated with Midwest Spine & Pain That
Is Stored At Premises Controlled by EClinicalWorks, 2
Technology Drive, Westborough, MA 01581

Case No. 2:19-mj-65

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A.

located in the _____ District of ___Massachusetts___ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. 1347 | Health Care Fraud |
| 21 U.S.C. 841 | Illegal Drug Distribution |
| 42 U.S.C. 1320a-7b | Illegal Remunerations |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Ryan Houston, Special Agent- HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Jan. 23, 2019

*Judge's signature*

City and state: Columbus, Ohio

Kimberly Jolson, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

This warrant applies to information associated with Midwest Spine and Pain (Midwest) that is stored at premises owned, maintained, controlled, or operated by eClinicalWorks, a company headquartered at 2 Technology Dr., Westborough, Massachusetts 01581.

## ATTACHMENT B – Items to be Seized

## I.      Information to be disclosed by eClinicalWorks (the "Provider")

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including electronic health records, files, schedules, logs, billing documentation, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A for the time period January 1, 2014 through the present:

a. The complete electronic health record for all records associated with the account including information on authorship associated with the record, and the date and time at which each record was created and edited.

b. All records or other information regarding the identification of the account users; such as full user name, user identification, access logs, and audit logs.

c. The types of services utilized and service agreements.

d. All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

e. All records pertaining to the electronic scheduling of the individuals associated with the Provider, to include such information as; daily schedules (patient appointments) for each Midwest provider, access logs identifying who created the schedules, audit logs associated with any edits or alterations to the schedules, and any other information/documentation pertaining to the creation and/or editing of the schedules.

    f.   All records pertaining to prescriptions issued by the Provider, to include; scanned copies of prescriptions, electronically generated prescriptions, dates the prescriptions were written/entered, and the name of the provider issuing the prescription.

    g.   Data of claims and billing related to the account, including electronic transmission of patient billing, superbills, procedure/diagnosis codes, patient information, schedules, other relevant medical billing data, CMS 1500 or UB04 forms, charges, payments, all claim images, and attachments stored in the Provider's EMR system.

## II.    Information to be seized by the government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 18 U.S.C. § 1035 (False Statements Relating to Health Care Matters), 18 U.S.C. § 1347 (Health Care Fraud), 21 U.S.C. § 841(a)(1) (Distribution of Controlled Substances), and 42 U.S.C. § 1320a-7b (Illegal Remunerations) that involve Midwest Spine and Pain (Midwest), Dr. Jimmy Henry (Henry), and employees of Midwest, known and unknown, occurring between January 1, 2014 and the present, including, but not limited to, for each account or identifier listed in Attachment A, information pertaining to the following matters:

    a.    Electronic health records of Midwest.

    b.    Billing records of claims submitted by Midwest.

    c.    Scheduling records of Midwest.

    d.    Prescriptions generated/written by Midwest providers/employees.

    e.    Correspondence with the Midwest.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH MIDWEST SPINE AND PAIN THAT IS STORED AT PREMISES CONTROLLED BY ECLINICALWORKS, 2 TECHNOLOGY DRIVE, WESTBOROUGH, MASSACHUSETTS, 01581 | Case No. 2:19-mj-65 **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Ryan Houston, Special Agent with the United States Department of Health & Human Services, Office of Inspector General, Office of Investigations (HHS-OIG-OI), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises owned, maintained, controlled, or operated by eClinicalWorks, a cloud-based electronic health records (EHR) provider headquartered at 2 Technology Dr., Westborough, Massachusetts 01581. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require eClinicalWorks to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I am a Special Agent employed by the United States Department of Health and Human Services (HHS), Office of Inspector General (OIG), Office of Investigations (OI). I have

been so employed since January 2011. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510 (7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

3.     As part of my duties I am authorized to conduct investigations, audits and inspections in connection with the administration and enforcement of laws, regulations, orders, contracts and programs in which the U.S. Department of Health and Human Services (HHS) is, or may be, a party of interest, and perform other duties on behalf of the Secretary of the Department of Health and Human Services. My chief responsibility is the investigation of fraud involving Federal Health Care Programs. As a Special Agent with the HHS-OIG-OI, I have received basic criminal investigator training as well as specialized training in the investigation of fraud and financial crime. Previously, I was employed as a Special Agent with the Ohio Attorney General's Office, Medicaid Fraud Control Unit (MFCU) for seven (7) years. My primary responsibility during this nearly fifteen (15) year period has been the investigation of criminal fraud against the health care programs commonly known as Medicare and Medicaid.

4.     The facts in this affidavit come from my participation in the investigation, from information provided to me by other federal and state agents involved in this investigation, and from witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1035 (False Statements Relating to Health Care Matters), 18 U.S.C. § 1347 (Health Care Fraud), 21 U.S.C. § 841(a)(1) (Distribution of Controlled Substances), and 42 U.S.C. § 1320a-7b (Illegal Remunerations) have been committed by Midwest Spine and Pain (Midwest), Dr. Jimmy Henry (Henry), and others.

2

There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

### Medical Benefit Programs

6.  Midwest Spine and Pain (Midwest), Dr. Jimmy Henry (Henry), and other have provided medical services to recipients of Medicare, Medicaid, and other healthcare benefit programs as that term is defined in Section 24(b) of Title 18, United States Code.

7.  Section 24(b) of Title 18, United States Code, defines a "healthcare benefit program as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

8.  Specifically, Medicare is a federal healthcare program that provides basic medical coverage for persons age 65 and over who are entitled to Social Security Benefits and for persons under age 65 who suffer from certain disabilities. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), an agency of the United States Department of Health and Human Services (HHS). Individuals who received benefits under Medicare are often referred to as Medicare "beneficiaries."

9.  Medicare is comprised of four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

10.  Medicare, through CMS, compensates the Medicare drug plan sponsors and pays the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans. Such payments

3

are called capitation fees. The capitation fee is adjusted periodically based on various factors, including the beneficiary's medical conditions. In addition, in some cases where a sponsor's expenses for a beneficiary's prescription drugs exceed that beneficiary's capitation fee, Medicare reimburses the sponsor for a portion of those additional expenses.

11.     Prior to participation in the Medicare Provider Program and receipt of a provider number, a provider signs an agreement with the United States. Upon acceptance into the Program, the provider agrees to submit to certain regulations issued by the United States.

12.     Upon receipt of a Provider Number, the provider can submit claims directly to Medicare. As part of the provider agreement, the provider agrees to accept the terms and regulations issued by Medicare and the United States. Providers attest to their responsibility to comply with Federal and Medicare laws and regulations on a recurring basis.

13.     Medicare reimbursement requests for professional services, such as those from a physician for medical services, are made on a Health Insurance Claim Form (Form HCFA 1500). Each claim form submitted for reimbursement requires the diagnosis, date of service, procedure code, type of services provided, charges, name of and provider number for the entity providing the services, and a designation of the selected method of reimbursement. These forms require the provider to certify that the services on the form were "medically indicated and necessary for the health of the patient" and that the claimed services are true and accurate. The form further warns that any false claim, documents, or concealing of a material fact may be prosecuted.

14.     Providers are required to keep patients' written medical records accurately and truthfully. According to the CMS rules governing health care providers, records must be kept at least six years. These written medical records serve as documentary support for the claim forms submitted by a provider to the programs and can be used to review the claims.

4

15.     Medicaid is a federal health care benefit program designed to provide medical services, equipment, and supplies to certain individuals and families with low income pursuant to the Social Security Act (Title 42, United States Code, Section 1396, et seq.). Medicaid is a health care benefit program as defined in 18 U.S.C. § 24(b). Approximately 60% of the funding for the Ohio Medicaid program is supplied by HHS. The Ohio Medicaid program is administered by the State of Ohio, through the Ohio Department of Medicaid (ODM).

16.     As part of the federally approved state plan, ODM has elected to contract with Medicaid Managed Care Organizations (MCOs) through contracts known as Contractor Risk Agreements (CRAs), which must conform to the requirements of 42 U.S.C. §§1395mm and §1396b(m), along with any related federal rules and regulations. 42 U.S. Code § 1396u-2. MCOs are health insurance companies that provide coordinated health care to Medicaid recipients. The MCOs contract directly with healthcare providers, including hospitals, doctors, and other health care providers to coordinate care and provide the health care services for Medicaid recipients. Providers who contract with an MCO, are known as Participating Providers. These providers likewise must enter into a "provider agreement" with the MCO in which the Participating Provider agrees to comply with all applicable state and federal statutes, regulations and guidelines. Participating Providers are assigned a unique provider identification number, which is necessary to be eligible to bill and receive reimbursement for services rendered to Medicaid recipients. As part of the Ohio Medicaid Program, Medicaid MCOs and the Participating Providers must furnish medical and health-related services pursuant to the state plan. Pursuant to the CRAs, ODM distributes the combined state and federal Medicaid funding to the MCOs, which then pay Participating Providers for treatment of Medicaid recipients. As the administrator of the Ohio Medicaid Program, ODM must track all services received by recipients, whether enrolled directly

5

with ODM or enrolled with a MCO. Therefore, Medicaid MCOs are required to submit to ODM encounter data, which includes detailed records of the services a Medicaid recipient received from a Participating Provider.

17.    ODM pays Medicaid claims submitted to it by valid Medicaid providers.

18.    A participating Medicaid provider is a person or business who agrees to (1) provide the service, (2) submit the claim, and (3) accept as payment in full the amount paid by the Ohio Medicaid program. The provider signs a Medicaid participation agreement, which requires them to keep records necessary to fully disclose the services provided to Medicaid patients. To receive Medicaid reimbursement for covered services, the provider electronically submits billing data to ODM, which pays the provider either by mail or electronic transfer.

19.    Medicaid pays participating health care providers on the basis of reasonable charges for covered services provided to beneficiaries. They assign to each provider a unique billing Provider Identification Number (PIN). Providers agree to know Medicaid reimbursement policies, which are communicated via regulations, manuals and newsletters.

20.    Medicaid providers agree to bill only for services actually rendered that are medically necessary to diagnose and treat illness or injury and for which the provider maintains adequate documentation. Medicaid currently requires health care providers to retain records of services for six (6) years from the date of payment for such services.

21.    Pursuant to Ohio Administrative Code Sections 5160-1-01(a) and (b), medical necessity is defined as: "procedures, items, or services that prevent, diagnose, evaluate, correct, ameliorate, or treat an adverse health condition such as an illness, injury, disease or its symptoms, emotional or behavioral dysfunction, intellectual deficit, cognitive impairment, or developmental disability…." Further, "[c]onditions of medical necessity are met if all the following apply:

6

(1) Meets generally accepted standards of medical practice;
(2) Clinically appropriate in its type, frequency, extent, duration, and delivery setting;
(3) Appropriate to the adverse health condition for which it is provided and is expected to produce the desired outcome;
(4) Is the lowest cost alternative that effectively addresses and treats the medical problem;
(5) Provides unique, essential, and appropriate information if it is used for diagnostic purposes; and
(6) Not provided primarily for the economic benefit of the provider nor for the convenience of the provider or anyone else other than the recipient."
O.A.C. §5160-1-01(c).

22.    Submission of a claim to a healthcare benefit program, whether public or private, involves representations by the provider that the services rendered were of a quality that met professionally recognized standards which include: (1) informed consent; (2) were medically necessary; and (3) were supported by documentation of such necessity.

23.    The Physicians' Current Procedural Terminology commonly known as the CPT code book, contains a listing of descriptive terms and identifying code numbers for the standardized reporting of approximately 7,500 medical services and procedures performed by medical providers.  The purpose of the CPT code book is to provide a uniform language that accurately describes medical, surgical and diagnostic services to facilitate nationwide communications among healthcare workers, patients and others.  CPT codes are used by healthcare benefit programs for tracking and processing medical claims.

**Controlled Substances**

24.    The Controlled Substances Act (CSA) governs the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions, the CSA makes it "unlawful for any person knowingly or intentionally" to "distribute or dispense ... a controlled substance" or conspire to do so.

7

25.     The term "controlled substance" means a drug or other substance included in Schedules I, II, III, IV or V of the CSA. The term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner; it includes the prescribing and administering of a controlled substance. The term "distribute" means to deliver (other than by administering or dispensing) a controlled substance. The term "practitioner" means a physician, medical doctor, dentist, or other person licensed, registered, or otherwise permitted by the United States or the jurisdiction in which he or she practiced, to distribute or dispense a controlled substance in the course of professional practice.

26.     Individual practitioners who wish to distribute or dispense controlled substance are required to register with the Attorney General of the United States before they are legally authorized to do so. Such individual practitioners are assigned a registration number by the Drug Enforcement Administration (DEA).

27.     Practitioners registered with the DEA are authorized under the CSA to write prescriptions for, or to otherwise dispense Schedule II, III, IV, and V controlled substances, so long as they comply with the requirements of their registrations pursuant to 21 U.S.C. §822(b). The CSA prohibits any person from knowingly and intentionally using a DEA registration of another in the course of distributing or dispensing a controlled substance.

28.     For practitioners, compliance with the terms of registration include that they can issue a prescription for a controlled substance to a patient if the prescriptions is "issued for a legitimate medical purpose … in the usual course of professional practice." 21 C.F.R. §1306.04(a). Practitioners violate the CSA if they issue a prescription for a controlled substance outside the usual course of professional medical practice and not for a legitimate medical purpose. Such

8

knowing and intentional violations subject the practitioner to criminal liability under 21 U.S.C. §841(a).

29. The CSA's scheduling of controlled substances is based on the drugs' potential for abuse, among other considerations. There are five schedules of controlled substances: Schedules I, II, III, IV and V. Drugs that have a high potential for abuse and can lead to severe psychological or physical dependence are classified as Schedule II controlled substances. Drugs that have a potential for abuse and can lead to moderate or low physical dependence or high psychological dependence are classified as Schedule III controlled substances. Drugs that have a low potential for abuse are classified as Schedule IV controlled substances.

30. Pursuant to the CSA, oxycodone is classified as a Schedule II narcotic controlled substance. Oxycodone is sold under a variety of brand names, including Oxycontin, Percocet, and Endocet, as well as generic forms. Oxycodone is one of the strongest prescription painkillers approved for use in the United States. Oxycodone has a high potential for abuse and is highly addictive. Oxycodone can cause euphoria, thus persons desiring a "high" may seek out the drug despite the lack of medical necessity.

31. Pursuant to the CSA, fentanyl, a potent synthetic opioid, is classified as a Schedule II controlled substance based on its potential for abuse and physical and psychological dependence. Fentanyl is much more potent than morphine, and is frequently abused because of its intense euphoric effects. Fentanyl pharmaceutical products are available in a variety of dosing mechanisms, including but not limited to, a sublingual spray under the brand name Subsys, which was manufactured by Insys Therapeutics (Insys). Due to the potency and high potential for addiction, the fentanyl spray Subsys was approved by the Food and Drug Administration (FDA) solely for "the management of breakthrough pain in cancer patients 18 years of age and older who

9

are already receiving and who are already tolerant to opioid therapy for their underlying persistent cancer pain."

32.     In Ohio there are additional guidelines for prescribing opioids for the treatment of chronic, non-terminal pain. Such guidelines suggest a Morphine Equivalent Dose (MED) of 80 as a "trigger point" for prescribers to reassess treatment options, as the odds of a patient overdose are higher at that point. Therefore, within the standard course of medical practice, a prescriber of an opioid would seek to prescribe a patient a narcotic medication with a MED of 80 or lower.

33.     In Ohio, the Ohio Automated Rx Reporting System (OARRS) is a prescription data monitoring report system that tracks the prescribing and dispensing of controlled substances.

## PROBABLE CAUSE

34.     Midwest Spine and Pain (Midwest) is an interventional pain management practice with office locations at 5051 Forest Drive, New Albany, OH 43054 and 7100 Graphics Way #3300, Lewis Center, OH 43035. Midwest is owned and operated by Dr. Jimmy Henry (Henry). Furthermore, Midwest reportedly employs several other practitioners including, Amy Kirk, CNP (Kirk), Dr. Robert Gould (Gould), and Felicia Ciamacco, PA (Ciamacco). Midwest currently has, and/or had in the past, provider agreements with Medicare and Ohio Medicaid.

35.     According to the Medicaid billing data, from January 12, 2015 through September 4, 2018, Ohio Medicaid paid Midwest and Henry a total of $306,302.17. According to a review of billing data, Medicare paid Midwest a total of $500,108.74 for services provided by Henry from December 22, 2014 through October 13, 2017.

10

36.     In May 2017, the Ohio Board of Pharmacy contacted the Ohio Medicaid Fraud Control Unit regarding allegations of potential overprescribing and fraud involving Henry. According to the referral, a patient of Henry (DT) died in July 2015, 3 days after receiving a prescription for Oxymorphone 5mg from Henry. A review of OARRS revealed DT received a total of 38 controlled substance prescriptions from 5 unique prescribers between 9/5/2014 and 7/21/2015. The autopsy report reportedly revealed DT died of acute Oxycodone intoxication while DT also tested positive for marijuana, benzodiazepines, and hydrocodone at the time of death. Finally, the referral also mentioned Henry's prescribing of Subsys, which was approved only for breakthrough pain in opioid-tolerant cancer patients.

37.     An analysis of OARRS data from January 2014 through May 2018 revealed Henry was the second highest prescriber of Subsys in the State of Ohio based on total number of Subsys prescriptions written, total number of days supplied Subsys, number of patients to whom he prescribed Subsys, and total milligrams of Subsys prescribed.

38.     Additional OARRS analysis compared the opiate prescribing of Midwest prescribers to other prescribers throughout the State of Ohio. The analysis revealed Kirk and Ciamacco both ranked in the top 30 statewide in number of doses (Kirk #8; Ciamacco #24) and total morphine equivalent dose (MED) (Kirk #1; Ciamacco #10).

39.     According to an interview of former Midwest patient MM on 9/11/17, MM stated she was treated by Henry for approximately 1 year from October 2014 through October 2015. MM confirmed Henry prescribed Subsys to her for back pain for approximately 7 months. MM stated she was in "full (opioid) addiction" by the time Henry first prescribed Subsys and described her addiction as a fast downward spiral. MM added that Subsys is "highly addictive"

11

and stated, "That Subsys is bad. People shouldn't have that unless they are gonna die." MM
stated that after she was discharged from Henry's practice, she was hospitalized for withdrawal
and entered an inpatient drug treatment program at the Women's Recovery Center. MM said she
has been drug free for the past two years.

40.     On 9/7/17, agents interviewed Midwest patient MC, who stated she has been a
patient of Henry since 2013. MC added she has seen Ciamacco for approximately 95% of her
visits recently and she couldn't recall the last time she actually saw Henry. MC recalled Henry's
staff approached her in June 2015 and told her she needed to speak with an unidentified Insys
drug rep about a new drug she should try. MC recalled the drug rep told her about Subsys,
which was a fast-acting fentanyl spray for cancer patients. Although she wasn't a cancer patient,
MC stated she was given a few samples of Subsys and ensured that the drug rep would take care
of all of the paperwork to get her insurance to cover the drug. MC stated she received Subsys for
approximately 2 years until her insurance finally stopped paying for the drug.

41.     On 10/12/17, agents interviewed former Midwest employee TT regarding her
employment with Henry. TT identified two Insys drug reps, Nicki Georges (Georges) and
Gabrielle Marinelli (Marinelli), who spent a lot of time at Midwest. TT stated Georges was
present in the Midwest office at least 3 times per week and Georges handled all of the
paperwork, including the prior authorizations, for Subsys. TT described Georges as "sketchy"
and stated it was not normal for a drug rep to be given access to the office beyond the front lobby
like Georges was granted. TT stated Henry and Georges had a very close relationship, including
many closed-door meetings and occasionally leaving the office in the same vehicle. TT said

Henry and Georges reportedly hosted speaking engagements at some local restaurants, but TT never attended any of the engagements.

42.     According to a review of documents obtained from Insys, on 10/10/2014 Henry entered into a contract with Insys to conduct speaker engagements on behalf of Insys in exchange for $2200 per speaker event. Further review of the documents provided by Insys revealed Insys paid Henry a total of $63,800 for 31 speaker events between 11/19/14 and 6/29/16. In addition, Insys also paid Henry a total of $5,217.50 for reportedly attending two training events.

43.     A review of Medicare Part D billing records show Medicare Part D paid a total of $3,001,749.22 for 259 Subsys claims prescribed by Henry during the timeframe he received payments from Insys. In addition, a review of Ohio Medicaid billing data revealed Ohio Medicaid paid a total of $467,292.67 for 40 Subsys prescriptions written by Henry during this same timeframe.

44.     A further review of documents provided by Insys revealed copies of sign-in sheets for the alleged speaker programs conducted by Henry on behalf of Insys. These sign-in sheets included information regarding the date/time, location, and attendees of the alleged event.

45.     On 8/17/18, agents interviewed Dr. Ann Sage (Sage) regarding an alleged speaker event with Henry that reportedly took place at her office on 5/1/15. Sage stated she is not familiar with Subsys and she did not recall any presentation about Subsys ever occurring at her office. After this agent explained what Subsys is, Sage added she would not likely have allowed a Subsys rep into her office, as this is not the type of medication she would ever prescribe. Sage

13

stated she does not know Henry and denied Henry has ever been at her office to speak on behalf of any drug. Finally, Sage denied she ever signs her name "A S", as shown on the sign-in sheet.

46.    On 8/17/18, agents interview Dr. Dave Pond (Pond) regarding an alleged speaker event with Henry that reportedly took place at his office on 5/15/15. Pond stated he is not familiar with Subsys or Henry and did not recall anyone ever conducting any presentation regarding Subsys at his office. After Pond reviewed his calendar, Pond confirmed he had no record of any speaker lunches scheduled on 5/15/15. Finally, Pond reviewed the signatures on the sign-in sheets and denied the signatures on the two sign-in sheets belonged to him or his former assistant.

47.    On 9/21/18, agents interviewed Dr. Melissa Dine (Dine) regarding an alleged speaker event with Henry that reportedly occurred in her office on 4/2/15. Dine stated she is not familiar with Subsys and stated no one has ever conducted a presentation involving Subsys in her office. Dine added she doesn't see many drug reps for controlled substances, as she operates a family practice. Dine stated she knows Henry, who is a pain management physician in the area to whom is occasionally refers patients. Dine recalled Henry came to her office several years ago when he was first opening his practice. She said his visit was about business development and trying to obtain referrals, however, and was not a presentation about any drug. Dine did not recall Henry ever visiting her office on any other occasion.

48.    According to interviews with former Henry employees, BT and EB, Henry utilizes an electronic health records system called "eClinicalworks" to chart all information related to his patient encounters.

14

49.     Based on the foregoing, there is probable cause to believe that Henry, and others at Midwest, are illegally distributing controlled substances, as well as causing the submission of fraudulent pharmaceutical claims to Medicaid and Medicare. Further, there is probable cause to believe that Henry received renumerations from Insys, in exchange for the prescribing of Subsys. Consequently, there is probable cause to believe that violations of 18 U.S.C. § 1035 (False Statements relating to Health Care Matters), 18 U.S.C. § 1347 (Health Care Fraud), 21 U.S.C. § 841 (Illegal Drug Distribution), 42 U.S.C. § 1320a-7b (Anti-Kickback Statute), have been committed by Henry, and others at Midwest.

## BACKGROUND CONCERNING ELECTRONIC HEALTH RECORDS

50.     In general, an electronic health record (EHR) is a digital version of a patient's paper medical chart, which include, inter alia, prescription information, medical services and tests provided, the medical provider rendering the services, and the billing information. Companies, such as eClinicalWorks, provider healthcare providers access to EHR software.

51.     According to eClinicalWorks' website, www.eclinicalworks.com, the company has over 115,000 providers and 800,000 medical professionals using their electronic health record (EHR) system. In addition, eClinicalWorks "was founded in 1999 to help get rid of paper from a doctor's office and make every single connection for the doctor; to the pharmacy, to the lab, and to the doctors supply chain." EClinicalWorks' website also states, "The Cloud keeps your patient and practice data safe, secure, and fully accessible regardless of time, network traffic, or Mother Nature. We have 9 data centers across the country so your data travels on the shortest path possible — this insures increased reliability, scalability, greater uptime and consistent high speed access." Therefore, the computers of eClinicalWorks are likely to contain stored electronic health records of

Midwest. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to determine what services were rendered and who rendered the services.

52.     In general, providers like eClinicalWorks ask each of their subscribers to provide certain personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, e-mail addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number). Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access Midwest's account.

53.     In some cases, account users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

16

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

54.      I anticipate executing this warrant under the Electronic Communications Privacy

Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require eClinicalWorks to disclose to the government copies of the records and other

information (including the content of communications) particularly described in Section I of

Attachment B.  Upon receipt of the information described in Section I of Attachment B,

government-authorized persons will review that information to locate the items described in

Section II of Attachment B.

## CONCLUSION

55.      Based on the forgoing, I request that the Court issue the proposed search warrant.

56.      This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction

over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

57.      Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.

Respectfully submitted,

Ryan Houston
Special Agent
U.S. Department of Health & Human Services
Office of Inspector General
Office of Investigations

17

Subscribed and sworn to before me on this ___23ʳᵈ___ day of January 2019.


_____
HONORABLE KIMBERLY JOLSON
UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by eClinicalWorks, and my official title is _____. I am a custodian of records for eClinicalWorks. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of eClinicalWorks, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

    a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

    b.     such records were kept in the ordinary course of a regularly conducted business activity of eClinicalWorks; and

    c.     such records were made by eClinicalWorks as a regular practice.

    I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____    _____

Date                         Signature

19